**In re GEM SLEEPWEAR COMPANY.**

**In re Leo BATTINO, a/k/a Leon Battino.**

**In re Leo NEGRIN, a/k/a Leon Negrin, Bankrupts.**

**William S. BROWN, Trustee in Bankruptcy,**

**v.**

**GEM SLEEPWEAR COMPANY, Leo Battino, a/k/a Leon Battino, Leo Negrin, a/k/a Leon Negrin.**

Nos. 74 B 1781–74 B 1783.

United States District Court, S. D. New York.

Dec. 11, 1978.

Ballon, Stoll &. Itzler, New York City, for trustee by M. David Graubard, New York City, of counsel.

Finley, Kumble, Wagner, Heine, Grutman & Underberg, New York City, for bankrupts by Gary Blum, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

The trustee in bankruptcy appeals from an opinion and order of Bankruptcy Judge Babitt which granted the motions of the three bankrupts to dismiss the trustee's complaints seeking to bar their discharge.

Gem Sleepwear Company was a partnership owned by two equal partners, the indi-

vidual bankrupts, Leo Battino and Leo Negrin. In October of 1973, Gem obtained a loan from Chase Manhattan Bank. The loan was for a term of one year, but Chase reserved the right to make a credit determination each quarter in order to decide whether the loan should be renewed or called in. It was Chase's practice to require a year-end written financial statement before renewing a loan if the maturity date was within two or three months of the borrower's ending fiscal date. The company's fiscal year ended May 31, 1974. A month or two thereafter its accountant, a Mr. Librach, prepared a typewritten financial statement. For reasons never adequately explained, there were two versions of the statement. One version had endorsed on it the legend "For use by management only." The other version did not have such a legend, although it was originally accompanied by a letter dated July 23, 1974, which concluded: "The enclosed statements are designed for use by the management only, they should not be construed as an inducement to the extension of credit."

On July 30, 1974, Negrin delivered to Chase the copy of the financial statement which did *not* have the cautionary legend. It was also not transmitted with the accountant's letter. Chase's loan officer, John Haggerty, had Negrin sign this financial statement in his presence. Financial statements were also delivered to two other creditors, United Virginia Factors Corporation and Lowenstein & Sons, Inc. The version delivered to United Virginia contained the cautionary legend "For Management use only" and a copy of the accountant's covering letter. The copy submitted to Lowenstein did not have the legend, but was delivered with the accountant's covering letter.[1]

The two versions of the financial statement contain the same figures. They were both unaudited and uncertified. They disclosed accounts receivable (net of reserves) of $233,405.57. Although not revealed by the statement, $206,921 of the receivables (*i.*

---

1. In the Bankruptcy Court the trustee claimed all three transactions were fraudulent. In this appeal, however, the trustee confines himself to the loan from the Chase Manhattan Bank.

e., 88 percent) were due from Feminette Loungewear, Inc. Feminette was a New York corporation wholly owned by Battino and Negrin. It filed its tax return as a small business corporation and distributed its profits and loss equally to them. It operated solely as a sales agent for Gem, from whom it purchased all of its finished garments. It had no independent or other activities.[2]

In addition, the financial statement included investments in the total sum of $36,023.94. In fact, these investments were solely in affiliated companies, Feminette and Ringgold Industries, Inc., a Louisiana corporation in which Negrin and Battino owned two-thirds of the stock. Previous financial statements submitted by Gem had listed affiliated accounts receivable and affiliated investments separately. After this submission, Chase reviewed and extended the loan.

As found by the learned Bankruptcy Judge (Opinion, at 11), the actions of the accountant, in failing to set forth separately accounts receivable from affiliated companies violated the rules of his profession as stated by the American Institute of Certified Public Accountants. See APB Accounting Principles, *Original Pronouncements as of June 30, 1973*, Vol. 2, p. 6007; see also Myer, *Financial Statement Analysis* 41 (1950). The accountant, Librach, had been employed by the three bankrupts for a number of years and was thoroughly familiar with their financial affairs. As stated earlier, there was no satisfactory explanation why two separate statements had been typed up, one with and one without the cautionary legend. His explanation for his accounting aberration in failing to separate transactions with affiliated companies was unconvincing. He said that he had proceeded in this way since the company's bookkeeper was behind in posting to the general ledger. (Why they should have been behind in light of their limited business activity was not explained.) Bankruptcy Judge Ba-

bitt found Librach's explanation to be "an inadequate reason for a professional to go forward in violation of elementary standards prescribed by a profession to govern the conduct of its people," (Opinion, at 11) and concluded that the whole situation was "indeed a puzzlement." (Opinion, at 19.) Nevertheless, Judge Babitt granted the bankrupts' motion to dismiss at the conclusion of the plaintiff's case without requiring them to testify, concluding that the financial statement was not false within the meaning of section 14c of the Bankruptcy Act and that, in any event, Chase (and the other creditors) did not rely on the financial statement.

With respect to the element of reliance, the bankruptcy court concluded that the financial statements were not crucial to renewal of the loan and that they were, at most, a partial inducement to it. It has long been the law in this circuit, however, that reliance need not be proved by direct testimony. The fact that a statement is made to support an application for credit and that the credit is thereafter given creates an inference of reliance. *Industrial Bank of Commerce v. Bissel*, 219 F.2d 624 (2d Cir. 1955). While not debating this point the court below distinguished the instant case as one dealing with a renewal of credit and not the original extension of a loan. This distinction, however, does not appear meaningful, and it would appear that the bankruptcy court misapplied the law with respect to the standard of reliance required to establish a *prima facie* case barring discharge in bankruptcy.

The cases cited below do not support the distinction between original and renewal applications. In *Berberich v. Northern Illinois Corp.* 190 F.2d 53 (7th Cir. 1951), the bankrupt had first borrowed from the HFC in 1945. The false statement was presented to the same lending institution in 1949. In *In re Savarese*, 56 F.Supp. 927 (E.D.N.Y.

---

**2.** The explanation given for the existence of Feminette was that a number of wholesale purchasers felt they could not make all of their purchases from Gem. Consequently, by having a separate sales unit with a different name, it was apparently possible for Gem to sell twice as many goods to their customers.

1944), the facts do not indicate whether this was an application for new or renewed credit. In *In re Sheridan,* 34 F.Supp. 286 (D.N.J.1940), the false statement was presented to obtain renewal of a previous loan. Reliance was proved by circumstantial evidence and the court concluded that the creditor parted with the merchandise on the strength of the false statement because of the closeness in time between the presentation of the statement and the shipment of merchandise. Moreover, other cases clearly establish that credit extensions based in part upon false statements can be used to bar a discharge. *Yates v. Boteler,* 163 F.2d 953 (9th Cir. 1947); *In re Robinette,* 117 F.Supp. 367 (N.D.Ohio 1953); *In re Axel,* 103 F.Supp. 810 (S.D.N.Y.1951), *aff'd,* 196 F.2d 217 (2d Cir. 1952); *In re Philpott,* 37 F.Supp. 43 (S.D.W.Va.1940).

■ Nonetheless, the opinion below argues that the absence of the cautionary legend was a reason for not relying upon the statement and that Chase might have been more justified in believing that the statement was accurate if the cautionary legend had been included. The logic leading to this conclusion is difficult to follow. Since the loan officer required Negrin to sign the statement when he delivered it, the court below concluded that this shows Chase was *not* relying on the statement. The basis for this logical inference is not evident.

Moreover, the course of dealing with Chase would seem consistent with the claim of reliance. In October of 1972 Chase had refused to renew a loan with Gem because the affiliated accounts receivable, including those from Feminette, constituted too large a portion of the receivables. All prior statements submitted to the bank had segregated associated company receivables and investments. The bank officer testified that he questioned Negrin about the change in receivables and was assured that Feminette receivables were not included therein. The bank officer claimed that he had been advised that Feminette was separated from Gem and that there were no inter-company or affiliated receivables. For purposes of

the burden of proof on a motion to dismiss, that was the extent of the record. In the final analysis, the only reason for rejecting the loan officer's claim of reliance was the fact that his contemporaneous reports made no reference to these oral representations. While this is undoubtedly a factor to be taken into consideration where there is a conflict in the evidence, at the point the motion to dismiss was granted the bank officer's version of what had occurred stood unrebutted.

It has been held that where the bankrupt gave financial information which is false, the burden is on the bankrupt to show that the lender did not rely on the information. *Morris Plan Industrial Bank v. Parker,* 79 U.S.App.D.C. 164, 143 F.2d 665, 666 (1944). This is a burden of proof to overcome the inference of reliance by the creditor, and not merely the burden of going forward. 1A *Collier on Bankruptcy* § 14.43, n.10, and cases cited. The Court concludes, therefore, that the court below was in error in finding as a matter of law an absence of reliance.

■ Returning to the question of whether the financial statement was false within the meaning of section 14c(3), the requirements are that the bankrupt must have: (1) obtained the money or property on credit, or an extension or renewal of credit; (2) that he did so on a materially false statement respecting his financial condition; (3) that such statement was in writing; (4) that the statement was made or published, or caused to be made or published, by the bankrupt or someone duly authorized by him; and (5) that the bankrupt was engaged in business and the money was obtained for the business. 1A *Collier on Bankruptcy,* § 14.39, at 1388.

The bankrupts argue that there was no proof that the accounts receivable were not collectible even though from an affiliated company. There was evidence, however, that Feminette had already factored the accounts and, therefore, would have no source of income with which to pay the receivables. Ultimately, when the bankruptcy occurred, the receivables were found to be old, uncollectible and worthless. This

is not surprising when one considers the fact that the associated company was merely a sales unit of Gem. In fact, the bankrupts owed this money to themselves.

In addition, the prior statements had shown a substantial receivable from associated companies, and the bank officer testified that he was quite concerned about it. He further testified that he was relieved to learn that Feminette was now a separate operation and that the indebtedness had been eliminated. The plaintiff, therefore, had met its burden of producing evidence establishing a materially false statement. Indeed, the court below did not dispute this aspect:

> "Basically, the Trustee's argument is that in appraising the financial statement of a potential borrower, receivables due from an affiliate are generally removed from the working capital position. Such treatment would have reduced Gem's working capital by more than 80%. This aspect of a financial statement has been recognized as one of the essential ones upon which creditors have a right to rely." (Opinion, at 6.)

■ The other requirements are indisputably present, with the single exception of whether the false statement was made with an intent to deceive on the part of the bankrupts. Judge Babitt found that there was no intent to deceive on the part of the bankrupts since there was no proof that they were sophisticated businessmen, and it may have been that they relied completely upon their accountant's opinion. He held that Bankruptcy Rule 407, which provides "[a]t the trial on a complaint objecting to discharge, the plaintiff has the burden of proving the facts essential to his objection," relieved the bankrupts of any obligation with respect to proof of intent. This Bankruptcy Rule, however, does not deal with the burden of going forward with evidence and leaves to the Court a formulation of rules governing such matters "in the light of such considerations as the difficulties of

proving the non-existence of a fact and establishing a fact as to which the evidence is likely to be more accessible to the bankrupt than to the objector." *Collier, supra,* § 14.12, at 1304–05. The shifting of the burden of establishing a lack of intent has been commonly applied by the courts. *See, e. g., In re Haggerty,* 165 F.2d 977, 979–80 (2d Cir. 1948); *In re Riceputo,* 41 F.Supp. 926, 927–28 (E.D.N.Y.1941). As *Collier* points out:

> "Evidence to establish the nonexistence of intent to deceive is more available to the bankrupt than evidence to prove the existence of such intent is to the plaintiff and this justifies the variance with the general rule as to burden of proof."

*Collier, supra,* § 14.43, at 1407.

The burden of going forward on the issue of intent to deceive was, therefore, upon the bankrupt.

■ Finally, the bankrupts argue that since Rule 810 of the Rules of Bankruptcy Procedure requires the Court to accept the Referee's findings unless clearly erroneous and to give due regard to his opportunity to judge the credibility of witnesses, this Court must accept his conclusion that there was an absence of intent to deceive.[3] However, this rule rests upon the opportunity of the Bankruptcy Judge to hear and observe the bankrupt. That did not occur in this case since the motion to dismiss was granted at the conclusion of the plaintiff's case.

It seems inconceivable that the bankrupts could have denied being aware that virtually all of their receivables, and all of their investments, were in affiliated companies. How they would have explained the accountant's aberration in preparing the financial statement which seriously distorted their monetary situation is still a matter for speculation. Whether they would acknowledge that, as had happened earlier, they could foresee a refusal to renew the loan because of extensive affiliated accounts receivable, is another debatable matter.

---

3. This would appear to have been the rule in this circuit even prior to the revision of the bankruptcy rules. *In re Tabebian,* 289 F.2d 793, 795 (2d Cir. 1961); *In re Ostrer,* 393 F.2d 646 (2d Cir. 1968).

Most important, of course, is whether Negrin would acknowledge making the oral statements concerning the divorce of Feminette from Gem, and the absence of affiliated receivables.

Intent is a question of fact. It is not a matter of law. However, the court below determined it as a matter of law based upon an interpretation of the bankruptcy rules, without hearing the testimony of the bankrupts. The Advisory Committee's notes to Rule 407 make it clear that this result was neither mandated nor intended:

> "This rule does not deal with the burden of going forward with the evidence. Subject to the allocation by the rule of the initial burden of producing evidence and the ultimate burden of persuasion, the rule leaves to the courts the formulation of rules governing the shift of the burden of going forward with the evidence in the light of such consideration as the difficulties of proving the nonexistence of a fact and of establishing a fact as to which the evidence is likely to be more accessible to the bankrupt than to the objector."

It is always prudent to reserve decision on a motion to dismiss at the conclusion of plaintiff's case and to hear all the evidence.[4]

Under the circumstances of this case, the Bankruptcy Judge should have heard the testimony of the bankrupts before making a factual finding as to whether they had an intent to deceive in submitting the erroneous financial statements. For all of these reasons, the opinion and order of the court below must be reversed. The case is remanded for further proceedings consistent with this opinion.

SO ORDERED.

---

4. *Cf. Gratian v. General Dynamics, Inc.*, 587 F.2d 121 (2d Cir. 1978).